# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

BARTLIT BECK LLP,

    Petitioner,

        v.

KAZUO OKADA,

    Respondent.

No. 19-cv-08508

Judge John F. Kness

## MEMORANDUM OPINION AND ORDER

In mid-2017, Respondent Kazuo Okada—a titan of the gaming industry—faced a crisis. Universal Entertainment Company ("UEC"), an entity in which Respondent held a substantial and valuable interest, was floundering in Nevada-based litigation in which Respondent himself was also a party. At stake was a financial interest valued in the hundreds of millions of dollars. Faced with long odds, Respondent needed a game-changer. But rather than beseeching Lady Luck, Respondent tried something more prosaic: he beefed up his legal team. Enter Bartlit Beck LLP, a nationally-recognized, Chicago-based law firm and the Petitioner in this case.

Petitioner and Respondent's new relationship, however, was not founded on a handshake or a few scribblings on a cocktail-lounge napkin. Both parties engaged in a lengthy, lawyer-driven, eyes-wide-open negotiation that ended in a comprehensive written agreement. Perhaps unsurprisingly, given the sheer magnitude of the underlying litigation, no aspect of the engagement was more heavily negotiated or essential to both sides than the nature and amount of Petitioner's fees. Under the

engagement agreement, Petitioner was to receive a monthly fee, expenses, and, depending upon the outcome, a success bonus of up to $50 million. Of particular relevance, the agreement contained an arbitration provision.

Five months and a great deal of legal work later, Respondent's fortunes improved when the Nevada case settled with a roughly $700 million recovery in UEC and Respondent's favor. But when Petitioner sought its $50 million success bonus, Respondent refused to pay up. That refusal led Petitioner to invoke the arbitration clause to which Respondent had earlier agreed.

After months of preliminary proceedings, the stage was set for an October 2019 evidentiary hearing before a panel (the "Panel") convened under the auspices of the International Institute for Conflict Prevention & Resolution. But late on the Friday before the Monday start of the hearing, Respondent told the Panel that he refused to attend because the engagement agreement was "invalid and therefore unenforceable." In Respondent's view, if Petitioner did not agree *ab initio* that the agreement was invalid, there was "no reason for me [Respondent] to attend the proposed arbitration." Respondent also alleged that he was "ill" and "unable to make the long journey to the USA," but then, as if to drive home the point, Respondent directed his counsel to tell the Panel that they were "not authorized to attend the arbitration because [Respondent] rejects the validity of the engagement agreement." Unimpressed, the Panel found Respondent in default, proceeded to the merits, and entered a judgment in Petitioner's favor.

Petitioner now asks this Court to confirm the Panel's award. Respondent contends that, because the Panel unfairly refused to postpone the hearing or to consider Respondent's proffered evidence, the Court should vacate the award and remand for a new arbitration. (R. 1; R. 34.)[1] In Respondent's view, he was denied a fair hearing under Article V(1)(b) of the New York Convention on foreign arbitral awards and Section 10(a)(3) of the Federal Arbitration Act.

Based on the undisputed record, Respondent has failed to show that he was denied due process in this arbitration. Federal courts are not permitted to reject an arbitrator's decision where, as here, there is a reasonable basis for it. And a party is not deprived of due process when an arbitrator proceeds with a long-scheduled proceeding in the face of a party's unreasonable refusal to participate. Respondent made pellucid that he was not going to sit at the arbitral table under any circumstances. That risky strategy was of debatable wisdom—but it is not debatable (at least not in this Court's view) that Respondent should now be bound to the results of the strategy he chose. Accordingly, the petition to confirm is granted.

## I.    BACKGROUND

### A.    The Nevada Litigation

This dispute has its genesis in a high-stakes Nevada case over the forced redemption of corporate stock. On one side was Respondent, a Japanese business magnate, and UEC, one of the world's largest manufacturers of gaming products. (R. 8 at 3-4.) Respondent founded UEC and owned a significant percentage of UEC's

---

[1] "R." denotes a citation to the docket.

stock. On the other side was Wynn Resorts Ltd. ("WRL"), a "developer and operator of high-end casinos." (R. 8 at 4.) At one time, UEC (and, by virtue of his stake in UEC, Respondent) held a significant stake in WRL; indeed, Respondent once served on WRL's board of directors. (*Id.*)

At issue was WRL's February 2012 forcible redemption of UEC's shares in WRL and its eviction of Respondent from WRL's board. According to the Panel, WRL took this step following "a yearlong investigation of [Respondent], headed by former FBI Director Louis Freeh, who found that [Respondent] likely violated the Foreign Corrupt Practices Act . . . and committed other illegal acts to advance his business interests in Asia." (*Id.* at 5.) To compensate UEC for the redeemed stock, WRL provided UEC with a ten-year, nontransferable note with a face value of $1.94 billion—an amount over $700 million lower than the market value of UEC's stake. (*Id.*) To add insult to injury, WRL then sued UEC and Respondent personally in a Nevada state court the very next day, seeking damages for breach of fiduciary duties and a declaration that WRL's "redemption of UEC's shares and removal of [Respondent] from the [WRL] Board of Directors were proper." (*Id.*) In response, UEC denied WRL's claims and filed a counterclaim (against both WRL and individual directors) seeking the difference in value between the note WRL provided and the market value of UEC's now-redeemed stake. (*Id.*)

Respondent enjoyed no honeymoon period in the Nevada courts. Following an interlocutory decision by the Nevada Supreme Court on an issue concerning the business judgment rule, the trial court granted summary judgment against

Respondent on his counterclaim against the individual directors; and, as the Panel found, the reasoning undergirding that decision meant that it was likely the trial court would be compelled via mandamus to grant summary judgment on the counterclaim against WRL itself. (R. 8 at 43.) Had that happened, the sole remaining step was a trial on WRL's claims against UEC and Respondent—and in a forum where the trial judge had already found, following an evidentiary hearing on an ancillary motion, that Respondent was "not a credible witness." (*Id*. at 8, 43.)

## B.     Respondent Engages Petitioner as New Counsel

At around the same time that Respondent was enduring setbacks in the Nevada litigation, he was presented with another crisis: the UEC board deposed Respondent as chair "based on allegations that he had misappropriated company funds." (*Id*. at 6.) This schism caused one of the firms representing Respondent to withdraw based upon a newly-created conflict of interest.

All of these issues led Respondent to conclude that he needed some new faces on his legal team. As the Panel explained, the "Global Chief Legal Officer of [Respondent']s wholly owned private company, Aruze Gaming America . . . led the search for a leading trial firm." (*Id*. at 9.) That search led quickly to Petitioner and the beginning of a whirlwind negotiation. (R. 17-3 at 1-10.)

On October 23, 2017, Respondent and representatives of Petitioner met in Las Vegas to discuss Petitioner's litigation experience and billing model. (R. 8 at 10.) According to the Panel, representatives for Petitioner explained to Respondent that Petitioner did not bill by the hour and instead tied its fees to its clients' outcome,

meaning that Petitioner's potential fees were at risk if it did not achieve a good outcome for its clients. (R. 8 at 10.)

In the days following the meeting, one of Petitioner's lead attorneys began to draw up a fee proposal for the engagement. (*Id*. at 11.) Petitioner initially proposed a monthly fixed fee of $700,000, a daily trial fee of $75,000, and a contingency fee of up to $50 million. (*Id*.) Petitioner stated that this fee structure, which included a much lower up-front fee than Petitioner usually charged, reflected the opportunity cost to Petitioner, which would have to "clear other matters off [its] plates" to represent Respondent. (*Id*.)

Following several more weeks of negotiations, the parties executed an engagement letter (the "Agreement") on December 9, 2017, which described, in relevant part, a contingency fee with a $50 million cap and contained an arbitration clause for "[a]ny dispute arising out of or relating to this [Agreement]." (R. 1 ¶ 7-8.) The Agreement provided that Petitioner would receive a flat monthly fee of $600,000 for the period starting November 2017 through the conclusion of trial. (R. 8 at 17.) In addition to the monthly fee, Petitioner would receive a contingency fee of one-third of any "Additional Value Recovered" (which the Agreement defined as "the difference between the Total Value Recovered and the Promissory Note Value"—that is to say, the difference between the settlement amount and the value of the promissory note UEC received for the redemption of its stock), "whether obtained through a judgment or a settlement," with a contingency fee cap of $50 million. (*Id*. at 12, 17)

C.     **The Nevada Settlement; Fee Dispute; and Resulting Arbitration**

Around the same time, Steve Wynn, the CEO of WRL, became embroiled in a sexual misconduct scandal. (R. 8 at 20.)  Fearing that it may lose its gaming license, WRL began to distance itself from Wynn and announced in February 2018 that it would no longer seek to enforce a 2010 shareholders agreement that prevented the signatories to the agreement from selling their shares without the consent of all other signatories. (*Id.*) Wynn had previously maintained that the agreement prevented his ex-wife from selling her shares, as he (one of the signatories) did not consent to sale. (*Id.*) But in the wake of the sexual misconduct scandal, Wynn filed a motion to moot his ex-wife's claims regarding the shareholder agreement restrictions so that both he and his ex-wife could sell their shares. (*Id.* at 20-21.)

Petitioner successfully opposed Wynn's motion on the grounds that he and his companies were also signatories to the shareholder agreement, and thus Wynn could not unilaterally declare it invalid without Petitioner's consent. (*Id.*) But because WRL wanted to distance itself from Wynn and could not do so unless he could sell his shares, WRL faced increased pressure to settle with Respondent and UEC. (*Id.* at 21.)

Thus, on March 8, 2018, the WRL litigation ended with a settlement large enough to trigger the maximum $50 million contingent fee. Respondent did not pay the fee, however, by its due date on May 7, 2018. (*Id.* at 23.) On July 27, 2018, following Respondent's failure to pay, Petitioner invoked the Agreement's dispute resolution clause and filed a Notice of Arbitration for breach of contract under the

International Institute for Conflict Prevention and Resolution ("CPR") Rules for Administered Arbitration. (R. 1 ¶ 11.)

For over eight months, Respondent fully participated in the arbitration process, which involved extensive briefings and discovery. [2] (R. 41 at 4; R. 44 at 5.) Through (new) counsel, Respondent attended a preliminary hearing on February 25, 2019, at which the Panel scheduled a Chicago-based, seven-day evidentiary hearing for Monday, October 28, 2019. (R. 41 at 5.) Respondent also appeared, through counsel, at the final pre-hearing conference on October 22, 2019, where the Panel acceded (over Petitioner's objection) to Respondent's request that his testimony occur only on the first two days of the hearing. This meant that the witnesses Petitioner planned to call would necessarily be taken out of order. (R. 17-2 at 29.) Up until the eve of trial, Respondent gave no hint that he would later reject the arbitral process. (R. 40-2 at 15.)

That said, Respondent's participation was riddled with uncooperative and obstructive conduct that "caused significant expense, delay, and at times violated the Panel's orders." (R. 17-2 at 26-27.) As the Panel emphasized, Respondent's "various dilatory tactics" during the discovery process included refusing to voluntarily produce "a critical witness who likely would have contradicted [Respondent] on important

---

[2] Respondent's participation included retaining counsel to represent him in the arbitration, selecting an arbitrator pursuant to the Agreement and CPR Rule 5.4, filing numerous motions (including challenges to jurisdiction, motions to compel discovery, and opposing motions filed by Petitioner), filing twenty affirmative defenses, participating in extensive discovery, deposing Petitioner's partners and expert witnesses, sitting for a two-day deposition, and engaging in extensive prehearing preparation (including filing a prehearing brief, a witness list, an exhibit list, and a motion seeking an order regarding the physical layout of the arbitration room). (R. 41 at 4-5.)

issues" for a scheduled deposition after firing him, repeatedly attempting to reschedule his own depositions, ignoring the Panel's Order to appear for a deposition, and failing to comply with the Panel's orders regarding discovery obligations. (*Id.*) One notable example was Respondent's failure to search for responsive documents before his deposition. (R. 17-2 at 27.) Respondent instead searched only the emails on his mobile device on the morning of his deposition and then asserted (perhaps implausibly) that no responsive documents existed. (*Id.*) When the Panel ordered Respondent to submit an affidavit attesting to that claim, Respondent again failed to comply. (*Id.*)

On Friday, October 25, 2019 at 9:11 p.m. CST—fewer than seventy-two hours before the evidentiary hearing was scheduled to commence—Respondent abandoned the arbitration via an email from his counsel to the Panel. According to Respondent's counsel, Respondent "recently informed me [counsel] that he is not attending the scheduled arbitration." (R. 36-20 at 1.) Counsel requested that the Panel "let us know how [it] wishes to proceed. . . ." (*Id.*) An hour later, the Panel responded that it would "certainly go forward on Monday with or without [Respondent]" and that his "failure to show up for a duly and long noticed hearing [was] material[] and may result in the Panel finding him in default. . . ." (R. 36-21 at 1.) The Panel also reminded Respondent of CPR Rule 16, the text of which it included in full in its email:

> Whenever a party fails to comply with these Rules, or any order of the Tribunal pursuant to these Rules, in a manner deemed material by the Tribunal, the Tribunal shall, if appropriate, fix a reasonable period of time for compliance and, if the party does not comply with said period, the Tribunal may impose a remedy it deems just, including an

> award on default. Prior to entering an award on default, the Tribunal shall require the non-defaulting party to produce such evidence and legal argument in support of its contentions as the Tribunal may deem appropriate. The Tribunal may receive such evidence and argument without the defaulting party's presence or participation.

(R. 36-21 at 1.)

Respondent replied to the Panel that same evening in a translated message provided by counsel:

> I believe that the *alleged* agreement that Bartlit Beck is trying to enforce against me is invalid and therefore unenforceable. I have explained many times the number of reasons that this alleged agreement is invalid. If Bartlit Beck does not agree that the alleged agreement is invalid, *there is no need for me to attend* the proposed arbitration. Further, I have become ill and am unable to make the long journey to the USA. *Even if I were to agree to participate* in the proposed arbitration, I am unable to do so due to my health.

(R. 36-22 at 1) (emphasis added).

A few hours later (on Saturday morning), the Panel requested that both parties prepare for argument as to "the appropriate remedy" for Respondent's nonappearance. (R. 36-23 at 1.) But Respondent's counsel instead replied that they are cancelling all flights and reservations after Respondent "informed [them] that [they] are not authorized to attend the arbitration because he rejects the validity of the engagement agreement *and objects to the proceeding*." (R. 36-24 at 1) (emphasis added). And so, after eight months of participation, Respondent abandoned the arbitration.

Invoking CPR Rule 16, the Panel proceeded to hear Petitioner's evidence alone. (R. 36-25 at 1.) The Panel refused to accept any new papers from Respondent, whom the Panel found had forfeited his right to present any defenses. (R. 17-2 at 2.) It further stated that it would base its award on whether Petitioner, the non-defaulting party, had met its burden of proof. (*Id*.) After the Panel granted Petitioner's request and agreed to accept written submissions in lieu of a live hearing, Petitioner submitted its Final Brief on Friday, November 1, 2019. (*Id*.; R. 36-27 at 1.)

On Monday, November 4, 2019, Respondent's counsel resurfaced and sent an email asking the Panel: "If I could convince [Respondent] to commit to a date certain to attend the arbitration hearing would you all consider granting us relief to reschedule the hearing?" (R. 36-28 at 1.) But the Panel saw "no good cause to do so":

> We see no good cause to do so. [Respondent] did not request a postponement. Instead, he represented to the Panel on October 25, 2019 that "if [Petitioner] does not agree that the alleged agreement is invalid, there is no need for me to attend the proposed arbitration." Further, he instructed his attorneys not to attend, even though the Panel had not yet determined whether it would be appropriate to present a defense in his absence. Accordingly, we will be proceeding on the basis of the papers submitted to us by [Petitioner].

(R. 36-28 at 2.)

On December 20, 2019, the Panel issued a 59-page Award in Petitioner's favor. (R. 17-2.) In its comprehensive written opinion, the Panel volunteered—despite Respondent's abandonment of the proceeding and despite not being required to do so under Rule 16—to consider Respondent's defenses from his previous submissions. (R. 17-2 at 54-55.) With respect to Respondent's absence, the Panel wrote:

> [Respondent]'s health is a transparently false excuse. If he truly were ill and could not travel, [Respondent] could have presented to the Panel a declaration from his treating physician attesting to his medical condition preventing his travel. [Respondent] could have, but did not, request a postponement or for an arrangement to take his testimony remotely, by live video feed, for example. And his decision to bar his attorneys from attending, even before the Panel had decided whether they could present his defense in his absence, proves that he had no intention of participating.

*(Id.* at 57-58.)

In its conclusion, the Panel characterized Respondent's last-minute desertion of the trial as "abusive and bad faith," before finding that Respondent "acted in accordance with his previous behavior." (*Id.* at 58.)

Respondent has, in the action now before this Court, for the first time produced purported medical records, including affidavits from his physicians, and a letter dated October 24, 2019. (R. 44-1 at 13-26.) In that letter, Respondent's physician states that Respondent was "required to rest in bed" due to a heart condition at the time the hearing was set to commence. (R. 44-1 at 14.) In response, Petitioner had provided purported social media posts from the week of October 29, 2019 that depict Respondent exercising at the gym and lifting weights. (R. 41-5 at 2-3; R. 41-6 at 2.)

## II. LEGAL STANDARD

The Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "Convention"), codified in Chapter 2 of the Federal Arbitration Act ("FAA"), *see* 9 U.S.C. §§ 201-08, governs arbitration awards arising out of agreements between United States citizens and citizens of foreign signatory nations. 9 U.S.C. § 202; *Pine Top Receivables of Ill., LLC v. Banco de Seguros del*

*Estado*, 771 F.3d 980, 988 (7th Cir. 2014) (per curiam). The Convention mandates that "the court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." 9 U.S.C. § 207 (*quoting* the Convention, Article V(1)(b)). Under Article V(1)(b) of the Convention, a court may vacate an arbitration award if "[t]he party against whom the award is invoked was [. . .] unable to present his case."

The FAA also provides, however, that "Chapter 1 [of the FAA, governing domestic disputes,] applies to actions and proceedings brought under [Chapter 2] to the extent that chapter is not in conflict with [Chapter 2] or the Convention as ratified by the United States." 9 U.S.C. § 208. Under FAA Section 10(a)(3), a court may vacate an award "where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy." 9 U.S.C. § 10(a)(3).

The Convention's "unable to present a defense" ground to vacate an award significantly overlaps with that found in Section 10(a)(3). *See Generica Ltd. v. Pharm. Basics, Inc.*, 125 F.3d 1123 (7th Cir. 1997) (clarifying Art. V(1)(b) to be a due process defense "as our jurisprudence defines it"); *Interface Sec. Sys., L.L.C. v. Edwards*, No. 03-4054, 2006 WL 8444029, at *14 (C.D. Ill. Mar. 30, 2006) (defining Section 10(a)(3) misconduct as occurring only when an arbitrator "fails to employ basic notions of fairness and due process and grossly and totally block[s] a party's right to be heard"). Under both the Convention and the FAA, the Court must find a denial of fundamental fairness in the arbitration proceedings to vacate the award. *See Mical v. Glick*, 581 F.

13

App'x 568, 570 (7th Cir. 2014) (nonprecedential disposition) (Section 10(a)(3)); *Slaney v. Int'l Amateur Athletic Fed'n,* 244 F.3d 580, 592 (7th Cir. 2001) (Art. V(1)(b)).

It appears, therefore, that a live issue exists as to whether a party may bring an action under FAA Section 10 "to vacate an award issued by an arbitrator in a U.S. jurisdiction, but governed by the Convention." *Johnson Controls, Inc. v. Edman Controls, Inc.*, 712 F.3d 1021, 1025 (7th Cir. 2013). The Seventh Circuit in *Johnson Controls* saved consideration of the issue for another day after finding no circumstances to justify a refusal to recognize or enforce the award under either FAA Section 10 or Art. V of the Convention. *See id.* Other courts have similarly declined to reach the issue. *See, e.g., Catalina Holdings (Bermuda) Ltd. v. Muriel*, No. 18-CV-05642, 2020 WL 1675464, at *2 (N.D. Ill. Apr. 6, 2020) (declining to reach the issue because both parties agreed that the same standards apply under both Section 10(a)(4) and Art. V(1)(c)); *Archer-Daniels-Midland Co. v. Paillardon*, 944 F. Supp. 2d 636, 644 (C.D. Ill. 2013) (avoiding issue after finding that respondent seeking to vacate award under both FAA Section 10 and Art. V did not meet burden under either standard). Because Respondent has not met his burden under either FAA Section 10(a)(3) or Art. V(1)(b) of the Convention, the Court—as in *Johnson*, *Catalina Holdings*, and *Paillardon*—likewise declines to address the issue here.

## III.   ANALYSIS

It is well established that judicial review of arbitration awards is extremely limited. *United States Soccer Fed'n, Inc. v. United States Nat'l Soccer Team Players Ass'n*, 838 F.3d 826, 831 (7th Cir. 2016) (quotations omitted). *See also IDS Life Ins.*

*Co. v. Royal Alliance Assocs., Inc.,* 266 F.3d 645, 650–51 (7th Cir. 2001) ("[N]either error nor clear error nor even gross error is a ground for vacating an award[;] if the district judge is satisfied that the arbitrators resolved the entire dispute and can figure out what that resolution is, he must confirm the award"). Accordingly, so long as "an arbitrator is even *arguably* construing or applying the contract and acting within the scope of this authority," the Court must uphold an arbitration award. *Johnson Controls, Inc.,* 712 F.3d at 1025-26 (*quoting Local 15, Int'l Bhd. of Elec. Workers v. Exelon Corp.,* 495 F.3d 779, 782-83 (7th Cir. 2007)). It is the burden of the party that seeks vacatur to prove that the arbitration award was improper. *See id.*

Respondent contends that the Panel denied him a fair hearing under Art. V(1)(b) of the Convention and Section 10(a)(3) of the FAA by (1) refusing to postpone the hearing in response to Respondent's disclosure of a medical condition; and (2) refusing to hear Respondent's defenses as part of its written submission process. (R. 35 at 6, 17.) Each argument is addressed in turn.

### A. The Panel Did Not Deny Respondent a Fair Hearing by Proceeding with the Arbitration

To warrant vacatur under either Art. V(1)(b) of the Convention or Section 10(a)(3) of the FAA, Respondent must show that the Panel's misconduct amounted to a denial of a fair hearing. *See Mical*, 581 F. App'x at 570 (Section 10(a)(3)); *Slaney*, 244 F.3d at 592 (Art. V(1)(b)). At the same time, federal courts typically defer to an arbitrator's decision on evidentiary and procedural matters. *E.g.*, *Dexter Axle Co. v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. 90, Lodge 1315,* 418 F.3d 762, 768 (7th Cir. 2005); *IDS Life Ins.*, 266 F.3d at 650-51; *Generica*, 125 F.3d at 1130 (7th

Cir. 1997). For this reason, the Court will not intervene in the Panel's decision to proceed with the hearing if any reasonable basis for it exists. *See Laws v. Morgan Stanley Dean Witter*, 452 F.3d 398, 400 (5th Cir. 2006); *El Dorado Sch. Dist. No. 15 v. Cont'l Cas. Co.*, 247 F.3d 843, 848 (8th Cir. 2001); *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir. 1997).

Respondent has not shown that the Panel lacked a reasonable basis in refusing to postpone the hearing. On the contrary, the record reflects several reasons that support the Panel's conclusion—all of which reflect the obvious conclusion that Respondent refused to proceed further with the arbitral process.

*First*, Respondent's explanations (personally and through counsel) show that the first and fundamental basis of his withdrawal was his objection to the fee agreement with Petitioner. Respondent initially informed the Panel, through his counsel, that he would not attend the hearing without any mention of his health. (R. 36-20 at 1.) Only after the Panel put Respondent on notice that his "failure to show up for a duly and long noticed hearing [was] material[] and may result in the Panel finding him in default" did Respondent allude to his health. In his second communication that evening, Respondent began with "[i]f [Petitioner] does not agree that the alleged agreement is invalid, there is no need for me to attend the proposed arbitration." (R. 36-22 at 1.) Only as an afterthought did Respondent add, "Further, I have become ill and am unable to make the long journey to the USA. Even if I were to agree to participate in the proposed arbitration, I am unable to do so due to my health." (*Id.*)

16

Respondent further undermined his proffered excuse when he later directed his lawyer to write, "[Respondent] informed us that we are not authorized to attend the arbitration *because he rejects the validity of the engagement agreement and objects to the proceeding.*" (R. 36-24 at 1) (emphasis added.)[3] Even more telling, a week later Respondent's counsel asked the Panel whether it would consider rescheduling the hearing "[i]f [he] could *convince* [Respondent] to commit to a date certain to attend the arbitration." (R. 36-28 at 1) (emphasis added.) These statements are facially inconsistent with any suggestion that Respondent's absence was based on his health;[4] at a minimum, they show that, healthy or not, Respondent was not going to participate further in the arbitration.

*Second*, Respondent offered the Panel no evidence to corroborate his health claim. Before the Panel dismissed Respondent's claim as false, it reasoned that "if [Respondent] were ill and could not travel, [he] could have presented to the Panel a declaration from his treating physician attesting to his medical condition preventing his travel [or] request a postponement or for an arrangement to take his testimony

---

[3] Respondent does not contend before this Court that he did not agree to arbitrate the dispute with Petitioner. Respondent's only objection here is to the manner in which the arbitration was conducted, not to the fact that the Panel concluded that the dispute was subject to arbitration in the first place.

[4] For this reason, the Court makes no finding on the contested issue whether Respondent was in fact suffering from a medical condition when the Panel convened the evidentiary hearing. Put differently, the Court is convinced the record amply shows that Respondent was not going to participate further in the arbitration no matter what. That fact makes it unnecessary (and, in view of the Panel's finding that the medical excuse was "transparently false," potentially improper) for the Court to resolve this contested issue. But the Court observes, tangentially, that were Respondent genuinely interested in a continuance based on a medical necessity, his approach was quite odd and appears not well-designed to achieve the desired result.

remotely, by live video feed." (R. 17-2 at 57-58.) Respondent does not dispute that he failed to request a postponement of the hearing before its long-scheduled start date,[5] nor that he failed to produce any evidence to support his health claim until appearing in this Court. (R. 44 at 10.)

Respondent argues instead that had the Panel "inquired further or been open to anything other than [his] in-person appearance," it would have learned that Respondent had received a diagnosis by a physician. (R. 35 at 14.) But the burden to produce supporting evidence and make appropriate motions was on Respondent, not the Panel. The Panel could only consider Respondent's health claim as he presented it. That Respondent for the first time now offers documents to substantiate his medical claim is of no moment. (R. 35 at 15.)

*Third*, Respondent prohibited his counsel from attending the hearing. This step leads to only one reasonable conclusion: that Respondent "had no intention of participating." (R. 17-2 at 57.) This was confirmed by Respondent's counsel. (R. 36-24.)

Respondent contends that his decision not to have his counsel proceed "represent[ed] the refusal to be sanctioned for having a medical condition," not a refusal to participate in the hearing altogether. (R. 44 at 11.) But Respondent

---

[5] Respondent suggests that, although he made no *express* request for a continuance before instructing his attorney not to show up, one was implied. (R. 44 at 10.) This is a dubious assertion. For example, earlier in the process, Respondent's lawyers showed no hesitation to make patent what they wanted, including, most notably, their successful request that Respondent be required to participate only on the first two days of the hearing. (R. 17-2 at 29; R. 41 at 4-5.) Either way, the point is largely irrelevant: the Panel cannot be faulted for failing to divine a request to postpone when it had already determined that Respondent provided "a transparently false excuse."

mischaracterizes as a sanction the Panel's initial decision to hold a Monday-morning hearing on "the appropriate remedy" for Respondent's recalcitrance. This hearing was intended to offer the Parties an opportunity to argue "whether it would be appropriate to present a defense in [Respondent's] absence." (R. 36-23 at 1.) Respondent, however, prohibited his counsel from attending before the Panel could even make such a determination. Far from supporting his current theory, Respondent's renewed obduracy—especially in the light of his view that the entire arbitration was illegitimate—undercuts any suggestion that the Panel "sanctioned" Respondent based on a purported medical condition about which it had received zero evidence.

*Fourth*, and finally, Respondent's last-minute excuse followed "various dilatory tactics during the discovery process that caused significant expense, delay, and at time violated the Panel's orders." (R. 17-2 at 26-27.) Respondent's track record together with his last-minute desertion led the Panel to characterize his conduct as "abusive and bad faith" and to find that Respondent "acted in accordance with his previous behavior." (R. 17-2 at 57.)

In sum, these reasons lead to one conclusion: that the Panel responded reasonably when faced with Respondent's last-minute antics. Under governing standards, then, Respondent has failed to show sufficient cause for the Panel to postpone the hearing under Section 10(a)(3) or that he was deprived of a meaningful opportunity to present his case under Art. V(1)(b) of the New York Convention.[6]

---

[6] Although Respondent's position is not entirely clear, it appears that the essence of his argument is that the Panel was obligated to postpone the hearing *sua sponte* and that its refusal to do so denied Respondent a fair hearing. But Respondent offers no authority for that proposition—and, if anything, courts have suggested the converse. *See e.g., Hoolahan v. IBC*

Although the Court is unaware of any judicial decision on point with the unique facts found here, several precedents are illuminating. For example, in *El Dorado School District No. 15 v. Continental Casualty Co.*, the Eighth Circuit denied a Section 10(a)(3) challenge where the arbitrator refused to postpone a hearing without any specific justifications and rendered a default award after the contesting party did not attend the hearing together with his counsel. 247 F.3d 843, 846 (8th Cir. 2001). As the court explained, a postponement would have been "inappropriate because the parties had expended considerable time, effort and money based on the hearing dates, because of the arbitrator's own schedule, [and] because appellants' counsel had made an insufficient showing that he was unable to attend any of the scheduled three-day hearing." *Id.* at 848. In the Eighth Circuit's view, "Any or all of these explanations would provide a reasonable basis for the decision not to postpone." *Id.* Here, the Panel (unlike the arbitrator in *El Dorado*) actually provided a plethora of reasons for its decision to proceed with the arbitration. *El Dorado*'s reasoning thus applies even more forcefully in this case and supports a finding that the Panel acted reasonably.

Respondent relies heavily on *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16 (2d Cir. 1997) and *Bisnoff v. King*, 154 F. Supp. 2d 630 (S.D.N.Y. 2001) in an attempt to show that the Panel created a fundamentally unfair hearing. Neither case compels a finding in Respondent's favor.

---

*Advanced Alloys Corp.*, 947 F.3d 101 (1st Cir. 2020) (arbitrator's failure to postpone a hearing *sua sponte* to allow for later testimony from a witness was not clear or obvious error); *Rocket Hill, Inc. v. Gen. Bldg. Laborers' Local 66, L.I.U.N.A., AFL-CIO*, No. 05CV4558ADSWDW, 2006 WL 8436037, at *4 (E.D.N.Y. Apr. 13, 2006) (arbitrator's failure to postpone hearing not misconduct under Section 10(a)(3) where the petitioner never requested an adjournment of the hearing).

*Tempo Shain* suggests that, absent a reasonable basis, a panel's refusal to grant an adjournment of an arbitral hearing due to a medical emergency constitutes misconduct if it results in the exclusion of material evidence prejudicing the parties in the dispute. But as discussed above, the Court finds that the Panel had a reasonable basis for its decision not to postpone the hearing—and that basis had nothing to do with Respondent's health.

In *Bisnoff*, the court upheld an arbitration award where the arbitrator denied a request to postpone the hearing after the petitioner alleged he experienced heart attack symptoms and offered a supporting doctor's letter. *Bisnoff*, 154 F. Supp. 2d at 639. Instead, the arbitrator allowed the petitioner to appear for a videotaped deposition or provide telephonic testimony. *Id.* But the petitioner rejected the alternatives, refused to testify, and together with his attorney did not attend the hearing, resulting in a default award against him. *Id.* at 635. In holding the hearing to be fundamentally fair under Section 10(a)(3), the court gave substantial deference to the arbitrator's reasons for denying the request and independently noted that the petitioner's health claim was not credible. *Id.* at 638.

Respondent cites *Bisnoff* to highlight that the Panel did not offer him alternative methods to testify. (R. 35 at 16.) Respondent overlooks that, unlike the petitioner in *Bisnoff*, Respondent did not make a request to postpone the hearing. More to the point, because he did not offer any evidence to the Panel to support his health claim, Respondent gave the Panel here even less reason to believe his health claim than did the petitioner in *Bisnoff*.

### B. The Refusal to Consider Evidence Presented by Respondent Did Not Render the Default Judgment Fundamentally Unfair

Respondent contends that the Panel's refusal to consider his evidence denied him his right to a fundamentally fair hearing. (R. 35 at 17-18.) A hearing is fundamentally fair so long as it provides each party an opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). But due process does not require hearing a party's evidence under all circumstances. *Slaney*, 244 F.3d at 592. This is especially true in the arbitration context, where "[a]n arbitrator enjoys wide latitude in conducting an arbitration hearing" and the rules of evidence and procedure differ from those in the judicial arena. *Id.* Respondent may thus only challenge the Panel's conduct if it "violated the agreement to arbitrate, as by corruption, evident partiality, exceeding their powers, etc.—conduct to which the parties did not consent when they included an arbitration clause in their contract." *Wise v. Wachovia Sec., LLC*, 450 F.3d 265, 269 (7th Cir. 2006).

Both Parties agreed that the CPR Rules for Administered Arbitration would control the arbitral procedure here. CPR Rule 16 provides a tribunal with discretion to render "an award on default" when a party fails to comply with its orders "in a manner deemed material by the Tribunal." The rule defines "an award on default" as one that requires the non-defaulting party to meet its burden of proof and may be rendered "without the defaulting party's presence or participation." When Respondent refused to attend the trial at the eleventh hour together with his counsel, the Panel deemed such conduct material. (R. 36-21 at 1.) Consistent with Rule 16, the

22

Panel defaulted Respondent by refusing to accept any additional papers from him and proceeding to base its Award on Petitioner's evidentiary submissions alone. (R. 36-25 at 1.; R. 17-2 at 2.)

Respondent contends that the Panel's adherence to Rule 16 nonetheless denied him a fair hearing because his refusal to participate was the necessary result of his medical condition, not a choice to abandon the arbitration. (R. 44 at 11, 13.) But, as explained above, the Panel reasonably concluded that Respondent voluntarily refused to participate in the arbitration and that Respondent's proffered excuse was pretextual.

In any event, Respondent has not shown that he suffered any prejudice from the manner in which the Panel conducted its Respondent-free proceedings. As the record demonstrates, the Panel made Petitioner produce "enough evidence and legal argument in support of its contentions as [the Panel] deem[ed] appropriate." (R. 17 at 30). To that end, the Panel reviewed all the evidence and arguments submitted by Petitioner, including the complete transcript of Respondent's deposition and all the exhibits Respondent marked for presentation at the evidentiary hearing before rendering its 59-page Award. (R. at 17-2 at 2; R. 40-2 at 8.) In the light of these steps, Respondent's suggestion that the Panel was akin to a kangaroo court is belied by the facts.

Respondent nevertheless maintains that he suffered prejudice from the Panel's refusal to hear his testimony and defenses, and he expends considerable effort summarizing the substantive disputes underlying the arbitration in an effort to

establish this contention. (R. 35 at 21-28.) Despite these efforts, the Court agrees with Petitioner that Respondent's efforts constitute an impermissible attempt to peek under the hood of the arbitration. *See Gingiss Int'l, Inc. v. Bormet*, 58 F.3d 328, 333 (7th Cir. 1995) ("[T]hinly veiled attempts to obtain appellate review of the arbitrator's decision . . . [are] not permitted under the FAA. Factual or legal errors by arbitrators—even clear or gross errors—do not authorize courts to annul awards"). Based on this clear and binding precedent, the Court has no choice but to disregard Respondent's attempt to call into doubt the substantive work of the Panel.

And, for whatever it may be worth, it bears emphasis that the definition in the CPR Rules of "award on default"—that is, requiring the non-defaulting party "to produce such evidence and legal argument in support of its contentions as the Tribunal may deem appropriate"—is eminently fair to a defaulting party. Indeed, in federal civil litigation, there is no equivalent general requirement that a court review the merits of a dispute before entering judgment against a party, either as a sanction or upon default. *See*, *e.g.*, Fed. R. Civ. P. 37(b)(2) (authorizing sanctions, including the entry of a default judgment, against a defendant when the party "fails to obey an order to provide or permit discovery"); *Wehrs v. Wells*, 688 F.3d 886, 892 (7th Cir. 2012) (upon the entry of default under Fed. R. Civ. P. 55(a), the "well-pled allegations of the complaint relating to liability are taken as true"); *see also United States v. Norwood*, 812 F. App'x 365, 368–69 (7th Cir. 2020) (per curiam) (nonprecedential disposition) (finding it within the judge's discretion to not hold a hearing on the

motions or accept late disclosures when appellant's excuses are not credible and late attempts to comply are inexcusable).

*   *   *

In the end, Respondent took a chance when he chose not to participate in an arbitral process to which he had agreed. That gambit failed; and the Court believes that Respondent should be held to live with the consequences of his choice. Put more precisely, because Respondent voluntarily walked away from the arbitration, he was not deprived of a fundamentally fair hearing when the Panel then resolved the case without Respondent's input. *See, e.g., Three S Delaware, Inc. v. Dataquick Info. Sys., Inc.*, 492 F.3d 520 (4th Cir. 2007); *El Dorado Sch. Dist.*, 247 F.3d 843; *Merch. Cash & Capital, LLC v. Jang Hwan Ko*, No. 14 CIV. 659 KPF, 2015 WL 3822836, at *4 (S.D.N.Y. June 19, 2015). Petitioner is entitled to a judgment in its favor.

## IV. CONCLUSION

For the reasons provided above, Petitioner's motion to confirm the arbitral award is granted. Respondent's cross-motion to vacate and remand is denied.

SO ORDERED.

Date: March 12, 2021

_____

JOHN F. KNESS
United States District Judge